UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CASE NUMBER:

**PETER W. BASSIL** 04-19086
**DEBRA D. BASSIL** SECTION A

DEBTORS

**LTSGO, L.L.C.** ADV. NUMBER:

PLAINTIFF 05-1064

V.

**PETER W. BASSIL**

DEFENDANT

**MEMORANDUM OPINION**

LTSGO, L.L.C. ("LTSGO") sued debtor Peter W. Bassil for a declaration under 11 U.S.C. §523(a)(2)(A) that Bassil's debt to it is nondischargeable. The Court concludes in this memorandum opinion that Bassil's debt to LTSGO is dischargeable.

**Facts**

This dispute grew out of debtor Peter Bassil's plan to enter the video poker truck stop business in 1999. He became interested in a truck stop in Port Fourchon, Louisiana owned and operated by Kajun Truck Plaza, L.L.C. ("Plaza"), which held the truck stop property under a lease with the Greater Lafourche Port Commission.[1] Bassil met

---

[1] July 1, 1997 Contract of Lease between Greater Lafourche Port Commission and Kajun Truck Plaza, L.L.C. (Defendant's Exhibit 2, pp. D00261 – 00278).

Anthony Toups,[2] the father of the owner(s) of the facility, through Patrick McGinity, Toups's criminal lawyer, and expressed his interest in taking over the operation in 2000. Bassil loaned the Toupses $30,000 to meet unspecified truck stop obligations in the hope of improving his chances in the bidding to take over the truck stop operation from its operator at the time, Expert Management ("Expert"). Expert had filed for bankruptcy relief in Shreveport. Eventually, Toups's daughters agreed that Bassil could take over the truck stop operation once Expert no longer occupied the premises.

### I.  Commercial Sublease between Plaza and Bayou Gaming Management, L.L.C.

Bassil's relationship with the truckstop began with a sublease[3] between Kajun and Bayou Gaming Management, L.L.C. ("Bayou") for a term beginning December 1, 2000. Jenny Toups Bousegard ("Jenny Toups" or "Toups") signed the sublease on Plaza's behalf. Bassil signed on behalf of Bayou. He represented himself as Bayou's sole owner, and claimed to be its president and chief executive officer. Bassil claimed that he and Gregory G. Faia, his lawyer, friend, confidant and one-time business associate, previously had acquired Bayou from Robert Moloney, Jr.[4] Bassil believed that operating the truck stop through Bayou would make it easier to obtain video gaming licenses for

---

[2]  Kajun Truck Plaza, L.L.C. owned the truck stop. Anthony Toups's daughters, Jenny Toups Bousegard and Tish Goldsmith, were the only members of the limited liability company. Each owned a one-half interest in Kajun at times relevant to this opinion.

[3]  Three different versions of the commercial sublease were admitted into evidence as Plaintiff's Exhibits 6, 7 and 8. Peter Bassil did not know why the documents differed. All three versions of the sublease recite that their term commences December 1, 2000, but dates on the documents differ. Specifically, the signatures on Exhibit 6 all are dated December 15, 2000; but Bassil's signature on Exhibit 7 (the only dated signature on that document) is dated December 1, 2000. The signatures on Exhibit 8 are undated.

[4]  Moloney, his parents and siblings own plaintiff LTSGO. Kurt Moloney, Robert's brother, is LTSGO's manager.

the facility because Bayou already had successfully completed the licensing process in connection with another venture, Ditcharo's Restaurant in New Orleans.

The commercial sublease required Bayou as lessee to use the premises for a convenience store, video poker game room and truck stop offering fuel services for trucks and automobiles, retail sales of groceries and sundries, and a restaurant.[5] Bayou was supposed to take over operation of the truck stop on December 1, 2000, though Jenny Toups could not recall when the management actually changed.

### II. Provenance of the Lease Assignment

Because plaintiff claims that Bassil's debt to it must be declared nondischargeable rest principally on the basis of an assignment of the commercial sublease to Kajun Truckstop & Casino, L.L.C. ("Kajun"), the assignment's origin is of special significance to this dispute.

After Bassil took over the truck stop operation at the end of 2000, he and the operators of the truck stop convenience store had serious disagreements concerning the operators' sublease, the value of its inventory and store accounting. Their disputes came to a head in March 2001 when Bassil concluded that the store operators were diverting receipts from the truck stop. The problems caused Bassil to decide to operate the truck stop through Kajun, a limited liability company he already had formed in December 2000.[6]

Bassil's decision to operate through Kajun necessitated his obtaining new state and local licenses and permits in the limited liability company's name for various

---

[5] Commercial sublease, ¶5 (Plaintiff's Exhibit 6).

[6] See December 19, 2000 Articles of Organization and Initial Report of Kajun Truckstop & Casino, L.L.C. (Defendant's Exhibit 3, pp. D00413 – 00418).

3

components of the truck stop business. Bassil drove to Thibodaux to obtain the permits, where an unspecified parish government employee asked him for a copy of the premises lease. Because the commercial sublease was between Bayou and Plaza (the Toupses' company), rather than Kajun (Bassil's company) and Plaza, Bassil testified that he called Gregory Faia for advice. According to Bassil's testimony, Faia told Bassil that he (Faia) could resolve the problem, and Faia's office then faxed him an Assignment of Lease[7] from Bayou to Kajun. Bassil testified that he then telephoned Tish Goldsmith (who at that time owned a 50% interest in Plaza with her sister, Jenny Toups) to advise that he was sending her the assignment document to resolve the lease issue. No independent evidence corroborated Bassil's claim that Faia's office had faxed him the assignment.

Jenny Toups' testimony regarding the lease assignment was not illuminating or credible. Toups, who was running the truck stop in 2001, testified that she was not familiar with Kajun. She said she thought that Bassil was operating the truck stop through Bayou, and claimed to have learned of Kajun's role only when the Orleans Parish District Attorney contacted her in April 2002 concerning a criminal investigation of Bassil for allegedly having forged her signature on the lease assignment. However, her claim of ignorance is inconsistent with other evidence. Specifically, in August 2001, several months before Jenny Toups's contact with the Orleans Parish authorities, she signed papers under penalty of perjury in support of Kajun's application for a Louisiana video gaming license.[8] Moreover, correspondence from Laris Insurance Agency, Inc., to Anthony Toups, Jenny Toups's father, confirmed that Toups knew that Bassil had been

---

[7] Assignment of Lease (Plaintiff's Exhibit 2). Though the assignment is dated December 1, 2000, Bassil admitted that it was not signed on that date.

[8] Video Poker Application for Kajun Truck Stop & Casino, L.L.C. (Defendant's Exhibit 3 in globo).

4

doing business under the name Kajun Truckstop & Casino, Inc. by September 18, 2001 at the latest.[9]

### III.  LTSGO's Agreement with Bassil and Kajun

LTSGO became involved with Bassil and the Port Fourchon truck stop project while the debtor was finalizing arrangements necessary to secure control of the premises for video poker operations.

At some point after Kajun began operating the truck stop in December 2000, Bassil and Robert Moloney, who already were friends, began discussing whether LTSGO would advance "bait money," as Bassil described it, to participate in the truck stop project. Moloney testified that he approached the other owners of LTSGO about financing the initial development of the truck stop. Bassil claimed to have legal right to occupy the truck stop premises, and Moloney in fact insisted that Bassil showed him a lease from the Toupses to "Bassil's company."[10] Bassil, on the other hand, testified that he showed Moloney only the sublease from Plaza to Bayou.

In any case, long before any documents allowing LTSGO to operate video poker at the truck stop came into being, LTSGO advanced money to Bassil. Bassil testified that LTSGO advanced $20,000 in December 2000 in connection with his truck stop operation.[11] Moreover, he acknowledged on cross-examination that he signed a $20,000

---

[9] September 18, 2001 fax from Laris Insurance Agency, Inc. to Anthony Toups (Defendant's Exhibit 1, pp. D00001 – 2). Bassil testified that the fax number on the document was for the machine at the truck stop. His testimony was not contradicted.

[10] March 15, 2006 trial transcript, p. 58, line 9-11. No evidence corroborated Robert Moloney's testimony that Plaza and Kajun were parties to a lease.

[11] Defendant's Exhibit 11 (the promissory note for LTSGO's advance to Bassil and Kajun Truckstop) is dated December 8, 2000 – *months* before the date of LTSGO's agreement with Kajun Truckstop. Both Moloney brothers' testimony concerning the reasons LTSGO advanced funds to Kajun nearly six months before LTSGO's agreement to operate video poker gaming at the truck stop was vague.

5

note on behalf of Port Fourchon Truckstop, the "d/b/a" of Kajun Truckstop, on December 8, 2000, before that entity even existed.[12]

By early 2001, Bassil concluded that he no longer had an agreement to acquire assets from the Expert bankruptcy trustee. He then began interviewing candidates, including LTSGO, to conduct video poker gaming at the truck stop. According to Kurt Moloney, Robert's brother and manager of LTSGO,[13] Bassil told Moloney that he (Bassil) had lawful possession of the truck stop. As proof, Bassil showed Kurt Moloney the December 2000 lease assignment from Bayou to Kajun (Plaintiff's Exhibit 2).

Bassil eventually entered into an agreement with LTSGO to install and operate video poker machines at the truck stop.[14] Kurt Moloney testified that by the time he, as LTSGO's manager, had signed the July 2001 agreement with Kajun, he had been given both the lease assignment and the sublease between Plaza and Bayou. Kurt Moloney also stated that he and other LTSGO employees had received the lease assignment and sublease while preparing Kajun's Louisiana video poker license application.[15]

---

[12] The Articles of Organization for Kajun were filed December 19, 2000 (Defendant's Exhibit 3 in globo). Other exhibits such as the checks for Kajun (Defendant's Exhibit 7), the Financial Questionnaire submitted by Kajun to the Louisiana Gaming Control Board (Defendant's Exhibit 3 in globo) and Kajun's letterhead (Defendant's Exhibit 6) evidence that Port Fourchon Truckstop was Kajun's assumed name or "d/b/a."

[13] Both Robert and Kurt Moloney had been involved in the video poker gaming business since at least 1996. Robert Moloney testified that Bayou had acquired its video poker device owner's license about 1996 and Kurt Moloney testified that LTSGO had been in the business of placing video gaming machines since about 1992 or 1993.

[14] Agreement dated July 9, 2001 between LTSGO, LLC and Kajun Truckstop & Casino, LLC d/b/a Port Fourchon Truckstop & Casino (Plaintiff's Exhibit 3). The agreement provided for additional loans of up to $150,000 from LTSGO to Kajun. Bassil testified that LTSGO also advanced a total of about $80,000 in connection with the operation, including $10,000 for the video poker license and concrete testing. Kajun executed a Promissory Note for $92,165.88 payable to LTSGO on October 26, 2001 (Plaintiff's Exhibit 1).

[15] LTSGO sent Bassil on March 30, 2001 a checklist of materials needed to complete the video poker license application. (Defendant's Exhibit 5). On that list, "Lease Agreement" is checked off as already having been provided.

6

Nevertheless, although LTSGO had received a copy of the sublease from Plaza to Bayou, Kurt Moloney admitted on cross-examination that he had not asked his brother Robert how Bayou came to have a lease with the Toupses' company.

### IV.  Pre-Bankruptcy State Court Litigation

Several months after their July 2001 agreement, the parties' plans for the truck stop began to unwind. In early April 2002, Jenny Toups relayed to Kurt Moloney what she learned about Bassil's alleged forgery of the lease assignment from the Orleans Parish District Attorney. Toups afterward decided not to allow LTSGO to continue operations at the truck stop, though her specific reasons for doing so were not made clear at trial.

On April 19, 2002, Bayou sued to evict Kajun and Bassil from the truck stop[16] to try to salvage its investment in the project. The record did not establish the outcome of that proceeding, but it is essentially irrelevant to this dispute, because Plaza obtained a judgment evicting Bayou from the truck stop in August 2002.[17] Bayou's eviction would have terminated Kajun's right to continue occupancy of the premises even if Bayou had validly assigned its sublease to Kajun.

Eventually, LTSGO sued Bassil and Kajun for damages. That litigation culminated in a settlement[18] and consent judgment[19] in LTSGO's favor and against Bassil and Kajun. The judgment awarded LTSGO $131,779.58 on promissory notes and

---

[16] Excerpts of record of "Bayou Gaming Management, L.L.C. v. Kajun Truckstop & Casino, L.L.C.," No. 93612 in the 17th Judicial District Court for the Parish of Lafourche, State of Louisiana (Plaintiff's Exhibit 10).

[17] Excerpts of record of "Kajun Truck Plaza, L.L.C. v. Bayou Gaming Management, L.L.C.," No. 94234 in the 17th Judicial District Court for the Parish of Lafourche, State of Louisiana (Plaintiff's Exhibit 11).

[18] April 14, 2004 Settlement Agreement (Plaintiff's Exhibit 5).

[19] May 10, 2004 Judgment in "LTSGO, LLC v. Kajun Truckstop & Casino, L.L.C. and Peter W. Bassil," No. 579-914 in the 24th Judicial District Court for Parish of Jefferson, State of Louisiana (included in Plaintiff's Exhibit 4).

7

$76,013.91 for legal fees precipitated by the eviction proceeding, as well as other sums.[20] The settlement agreement reserved LTSGO's right to challenge the dischargeability of Bassil's liability on the judgment as having resulted from fraud.[21]

**Analysis**

I. **Burden of Proof and Elements under 11 U.S.C. §523(a)(2)(A)**

To succeed under section 523(a)(2)(A), the plaintiff must prove that: (1) the debtor made representations; (2) at the time the representations were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) the creditor relied on the representations; and (5) the creditor sustained losses as a proximate result of the representations. *In re Quinlivan*, 434 F.3d 314, 317 (5th Cir. 2005), quoting *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

Debts falling within the ambit of section 523(a)(2)(A) are those obtained by fraud "involving moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made." *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992) (citation omitted). Although intent to deceive may be inferred from a "reckless disregard for the truth or falsity of a statement . . . ," *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005), a debtor's "honest belief, even if unreasonable, that a representation is true and that the [debtor] has information to justify it does not amount to an intent to deceive." *Id.* (citation omitted).

---

[20] First Supplemental and Amending Petition on Promissory Note, ¶15 (Plaintiff's Exhibit 5).

[21] Settlement Agreement, ¶3 (Plaintiff's Exhibit 6).

8

Section 523(a)(2)(A) also requires that a creditor justifiably rely on the debtor's misrepresentations. *Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance "'is a matter of the qualities and characteristics *of the particular plaintiff*, and the *circumstances* of the particular case, rather than of the application of a *community standard* of conduct to all cases.'" *In re Mercer*, 246 F.3d 391, 418 (5th Cir. 2001), quoting *Field*, 517 U.S. at 70-71 (quoting Restatement (Second) of Torts §545A comment b (1976)) (emphasis in original) Though *Mercer* dealt with the dischargeability of credit card debt, its discussion of justifiable reliance applies to all actions under §523(a)(2)(A).

A creditor who is "the recipient of a fraudulent misrepresentation may justifiably rely on it unless its falsity is obvious or there are 'red flags' indicating such reliance is unwarranted." *Id.*, quoting *Field*, 517 U.S. at 71 - 72 (quoting W. PROSSER, LAW OF TORTS §108, p. 718 (4th ed. 1971)). Where, under the particular circumstances, the facts relating to the alleged misrepresentation "'should be apparent'" to a person of the creditor's knowledge and intelligence upon a cursory glance, or where the creditor "'has discovered something which should serve as a warning that he is being deceived,'" the creditor is required to make an independent investigation. *Id.*

## II. Bassil's Misrepresentations

### a. Bassil lacked authority to act on behalf of Bayou.

Peter Bassil's claim on direct examination in plaintiff's case in chief that he and Gregory Faia bought Bayou in 1998 was not substantiated. Robert Moloney testified that he has been the sole owner of Bayou since its inception, and that he has always been its sole officer and director. Moloney testified that he orally had agreed to sell Bassil or Faia

part of Bayou in the future if they secured more locations in which Bayou could arrange to install and operate video poker devices, but no evidence supports a finding that ever happened.

At trial Bassil deflected most questions regarding documents relating to his alleged ownership of Bayou by claiming that his lawyer, Faia, prepared all the documents; that he (Bassil) "had no reason to involve himself in that side of the business"; and that he consulted Faia on everything he did. Yet, Bassil did not call Greg Faia as a witness or subpoena him to testify at trial, which supports an inference that Faia would not have corroborated Bassil's claims.[22]

Bassil also admitted that he never received any income from Bayou. Moreover, despite insisting on the stand that Bayou's tax returns incorrectly reflected that Robert Moloney was its sole owner, Bassil conceded that he never complained to the Internal Revenue Service about the alleged error.

The only independent evidence supporting Bassil's claim of ownership of any interest in Bayou is the November 1997 resolution relating to bank accounts that he, Faia and Robert Moloney executed.[23] This document does not support a finding or conclusion that Bassil had authority to sign the Commercial Sublease on behalf of Bayou.

---

[22] Bassil testified on cross-examination during plaintiff's case in chief that he did not subpoena Faia because he expected LTSGO to do so. However, on re-direct examination in his own case in chief Bassil asserted that Faia would lie if called to testify on his behalf, and would not support Bassil's claims.

[23] Resolution of Members of Bayou Gaming (Defendant's Exhibit 12). Robert Moloney admitted on cross-examination that Bassil did have some authority to act for Bayou in connection with the video poker machines installed at Ditcharo's, a New Orleans restaurant in which Bassil acquired an interest in 1991. However, Moloney disputed the effect of the November 11, 1997 resolution. That bank form resolution only authorized Bassil, "Maloney" (sic) and Faia to conduct bank transactions on behalf of the company. In any case, it does not establish Bassil's status as an officer because limited liability companies do not have officers. *See* La. R.S. 12:1311, 1312.

10

The evidence supports a finding and conclusion that Bassil had no authority to act for Bayou with regard to the Port Fourchon truckstop, and specifically that he had no authority to sign the assignment of sublease on Bayou's behalf.

### b. Bassil misrepresented to LTSGO that Kajun had a valid assignment of Bayou's interest in the commercial sublease.

Bassil was neither an owner of Bayou, nor empowered by Robert Moloney, Jr., Bayou's sole owner, to sign the lease assignment on Bayou's behalf. Thus, Bassil had no authority to consent to an assignment of the commercial sublease to Kajun, and falsely represented to LTSGO, through use of the assignment of the commercial sublease, that his limited liability company lawfully held the truck stop premises.

Further, the circumstances surrounding the origin and execution of the assignment of lease are suspicious. Bassil testified that Faia's office faxed it to him at a parish government office (the local health department) in Thibodaux. He said that the document had been signed and notarized before it was faxed, and lacked only his signature to be complete. However, the credible evidence established that the signatures on the lease assignment were unauthorized, and likely were forgeries. Jenny Toups denied signing the lease assignment on Plaza's behalf, and denied ever being asked to consent to Bayou's assignment of the lease. Additionally, though the assignment recites that Patrick McGinity, a lawyer, was the notary public before whom the document was signed, Mr. McGinity testified at trial that he had not signed or notarized any version of the document. Considering this evidence, Peter Bassil's testimony that he was "pretty sure" he'd seen McGinity's signature on one version of the document is not credible, especially given the defendant's failure to offer any independent evidence corroborating his version of the events.

Additionally, Peter Bassil's explanation of the reason Bayou assigned the lease to Kajun is totally implausible. If, as Bassil initially testified, he caused Bayou to enter into the commercial sublease in order to simplify licensing of the truck stop for video poker, it made absolutely no sense for Bayou to assign its rights under the commercial sublease to Kajun, because that newly-formed limited liability company did not have a video poker license and therefore would not previously have been found to be eligible for licensing by the Louisiana video poker authorities.

In sum, Bassil's version of the relevant events is not credible.

Accordingly, LTSGO has established by a preponderance of the evidence that the assignment of lease was not legitimate, and its use was a misrepresentation by the debtor. The evidence established that Bassil either made the representation to LTSGO in reckless disregard for the truth, or with actual intent to defraud LTSGO. In either case, Bassil intended to deceive LTSGO concerning Kajun's contractual relationship with Plaza and its right to occupy the truckstop premises.

### III. LTSGO Did Not Justifiably Rely on Bassil's Misrepresentations

    **a. LTSGO did not establish that it actually and justifiably relied on the lease assignment in making the initial advance.**

Bassil's misrepresentation does not prove LTSGO's case in chief, however.

LTSGO contends that had it known that the lease assignment was invalid, it would not have entered into the July 9, 2001 agreement with Bassil's limited liability company and presumably would not have loaned the company any money in December 2000.

However, LTSGO advanced $20,000 to Bassil on December 8, 2000, *before* the lease assignment from Bayou to Kajun could have been effective. Kajun was not even

12

organized until December 19, 2000. Therefore, LTSGO has not proven that it actually and justifiably relied on any misrepresentation by Bassil about the lease assignment when it first advanced funds to Bassil and his company. *Quinlivan*, 434 F.3d at 317.

### b. LTSGO also did not establish its justifiable reliance on Bassil's misrepresentations before it made the additional advances.

Both Robert and Kurt Moloney testified that LTSGO relied on Bassil's representations that he had legal possession of the truck stop when Bassil came to LTSGO with the truck stop proposal and request that LTSGO fund its continued operations. Peter Bassil actually gave Kurt Moloney a copy of the lease assignment that Bassil claimed established his right to possession. Moreover, Kurt Moloney also testified that LTSGO would not have entered into the agreement with Kajun Truckstop had it known the lease assignment had not been validly executed, with properly notarized signatures.

Although these facts establish LTSGO's *actual* reliance on Bassil's misrepresentations regarding his company's right to occupy the truck stop premises, LTSGO's reliance must have been *justifiable* to render Bassil's debt non-dischargeable under Bankruptcy Code section 523(a)(2)(A). Specifically, LTSGO's reliance on Bassil's misleading statements was justifiable unless, based on the knowledge of its representatives and under the particular circumstances of this case, the representations regarding Kajun's right to lease the truck stop from the Toupses' company were obviously false or there were "red flags" as to the truth of those representations. *See Mercer*, 246 F.3d at 418. If LTSGO learned facts that should have warned it that Bassil's representations may have been false *before* it entered the agreement with Kajun and

13

advanced funds pursuant to the agreement, its reliance on Bassil's misrepresentations, without further investigation, was not justifiable. *See Mercer*, 246 F.3d at 418.

The evidence supports a finding and conclusion that LTSGO did not justifiably rely on Bassil's claim that he or his company lawfully held the truck stop premises. Specifically, Bassil approached Robert Moloney in December 2000 with his initial proposal that LTSGO advance money to Bassil's company in connection with the Port Fourchon operation. Robert Moloney, who previously had dealt with Bassil, apparently did not question Bassil's representation that he lawfully occupied the truck stop, since Moloney did not bother to verify it. Had the parties stopped there, and LTSGO proceeded with the parties' arrangement without more information, LTSGO may have justifiably relied on the information Bassil conveyed to it. However, Kurt Moloney, LTSGO's manager, had received both the lease assignment and the original sublease *before* LTSGO entered the July 2001 agreement with Kajun. Bayou was a party to both the sublease and the lease assignment. Yet, for some reason, Kurt did not question Robert about Bayou's assignment of the lease to Kajun, though he admitted knowing that the assignor was Bayou, his brother's company.

Moreover, Kurt Moloney stated that he and LTSGO's employees had obtained both the original sublease and the lease assignment to prepare Kajun's August 2001 video poker license application. The March 30, 2001 letter from LTSGO to Bassil requesting additional materials for the video poker licensing application indicates that the "lease agreement" had already been provided to LTSGO.

LTSGO's access to this information before finalizing its deal with Bassil and Kajun should have caused Moloney to investigate Bassil's statements. Plus, the

14

Moloneys were experienced enough in the video gaming business to know that it was crucial to the application process to have a valid lease of the premises.

Because the Moloneys and LTSGO had knowledge of facts relevant to the truth of Bassil's claim that Kajun was legally occupying the truck stop *before* the July 9, 2001 agreement, *before* the August 2001 application and *before* the additional advances in October 2001, its reliance on Bassil's misrepresentations regarding Kajun's right to legal possession of the Port Fourchon truck stop premises was not *justifiable*.

## Conclusion

The evidence established that LTSGO did not justifiably rely on Bassil's misrepresentations concerning Kajun's possession and occupancy of the truck stop premises. Accordingly, Peter Bassil's debt to LTSGO is dischargeable. By separate Judgment, LTSGO's Complaint will be dismissed.

Baton Rouge, Louisiana, August 28, 2006.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE

15